UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| Plaintiff, ) | |
| v. ) | Cause No. 1:20-CR-48-HAB |
| EDDIE M. KNOX ) | |
| Defendant. ) | |

## OPINION AND ORDER

Defendant Eddie Knox, known by the sobriquets E-Nox and McNeil, participated in a large methamphetamine conspiracy. Although he had multiple roles, Knox's primary one was transporting and running drugs for the conspiracy's leader "Big Head" also known as Frederick Morgan, Jr. (Morgan Jr.). Knox's reward for his participation in the operation was not cold hard cash as one might expect. He "just did it for dope."[1] His motivations aside, he now faces a healthy guideline range of 360 months to life for his part in the conspiracy.

Before the Court are Defendant's objections to the Presentence Investigation Report (ECF No. 262). Defendant requested an evidentiary hearing, which the Court held on December 15, 2022. The objections are now fully briefed (ECF Nos. 327, 334, 335) and are ripe for determination.[2] For the following reasons, the Defendant's objections will be OVERRULED.

### DISCUSSION

---

[1] Evid. Hr'g Tr. at 56: "I ain't never like get no dope to nobody to make no money. I always got dope to use drugs. I ain't never like -- I don't be like going to the mall every day, and buying cars and all. I don't do -- I don't do that. I don't dress, get my haircut every week. I don't do none of that." The references to the hearing transcript throughout this Opinion and Order are from the Court's transcript provided at the Court's request by the court reporter.

[2] Knox also moved to strike supplemental evidence presented by the Government in response to the Defendant's unanticipated testimony at the hearing. (ECF No. 333). The Court did not consider the supplemental evidence in its decision. Therefore, the Motion is DENIED as MOOT.

Knox pleaded guilty to conspiring to distribute and to possess with intent to distribute more than 50 grams of methamphetamine between May 2019 and August 2020. As mentioned above, Knox was part of a larger conspiracy involving five other co-defendants, all of whom entered guilty pleas and received significant sentences for their respective roles. As part of his plea agreement, Knox agreed that the Court would determine the drug calculation for relevant conduct purposes. (Plea Agreement, ECF No. 155 ¶ 8(c)(iv)).

The probation office prepared a Presentence Investigation Report (PSR, ECF No. 242) and determined Knox was responsible for converted drug weights between 10,000 and 30,000 kilograms. The officer also assessed Knox with a two-level enhancement under U.S.S.G. §3C1.1 for obstruction of justice, a two-level enhancement for maintaining a drug premises under U.S.S.G. §2D1.1(b)(12) and a two-level increase under §2D1.1(b)(1) because Knox possessed a firearm.[3] After application of a three-point reduction for acceptance of responsibility, the above determinations yielded an offense level of 37. The offense level along with Knox's extensive criminal history – scoring him 22 total criminal history points – led to a guideline imprisonment range of 360 months to life.

The drug amount was based on transactions involving Knox between February 11, 2020, and August 13, 2020, along with drugs located at his residence during the execution of a search warrant on August 27, 2020, and methamphetamine seized from a second residence on Wayne Trace Boulevard the same day. The probation officer noted that the drug quantity in the PSR was a "conservative estimate" of Knox's conduct in that it only included laboratory analysis from drugs sold and recovered during search warrants. (PSR ¶ 53). Knox objects to the drug amounts included

---

[3] Knox agreed in his plea agreement that he maintained a premises for distributing a controlled substance and that he possessed a dangerous weapon.

2

from transactions on June 5, 2020, July 16, 2020, and July 28, 2020. He also objects to the amounts found in the Wayne Trace home. Finally, Knox challenges the obstruction of justice enhancement. The Court turns now to these objections.

### A. Drug Quantity

The Sentencing Guidelines instruct district courts to base the offense level on the defendant's "relevant conduct," a calculation governed by § 1B1.3 of the Guidelines. In drug cases, the quantity of drugs for which the defendant is held responsible is "frequently the single most important determinant of the length of the defendant's sentence under the Guidelines." *United States v. Acosta,* 85 F.3d 275, 281–82 (7th Cir.1996). And so, it is true here.

The standards that apply to drug-quantity findings at sentencing are well established:

> [A] preponderance of the evidence is all that is required for a factual finding of drug quantity under the Sentencing Guidelines, due process concerns notwithstanding. Determining drug quantities under the Sentencing Guidelines is often difficult, and district courts may make reasonable though imprecise estimates based on information that has indicia of reliability.... At the same time, ... a district court choosing among plausible estimates of drug quantity should normally err on the side of caution.

*United States v. Bozovich*, 782 F.3d 814, 818 (7th Cir. 2015) (citations omitted) (internal quotation marks omitted). The relevant quantity includes the drugs the defendant himself distributed or possessed. But when a defendant is involved in jointly undertaken criminal activity, he is accountable for the actions of others within the scope of and in furtherance of that activity, and reasonably foreseeable to him. U.S.S.G. § 1B1.3(a), Application Note 3(A); *see also United States v. Brown*, 822 F.3d 966, 976 (7th Cir. 2016). Ultimately, it is the Government's burden to prove the drug quantity.

### 1. *Knox's Involvement in the Conspiracy*

The PSR details the facts of Knox's involvement in the conspiracy in ¶¶s 11–49. A sentencing judge may "rely on a presentence report if it 'is well-supported and appears reliable.'" *United States v. Marks*, 864 F.3d 575, 580 (7th Cir. 2017). Further, the district court may accept an undisputed portion of a presentence report as fact. Fed. R. Civ. P. 32(i)(3)(A). Knox has not objected generally to the offense conduct or the facts in these paragraphs and thus the Court accepts these facts to the extent that they are consistent with the Government's evidence at the hearing.

The Government presented the testimony of ATF Agent Sean Skender (Agent Skender) at the hearing to establish the broad conspiracy facts detailed in the PSR. Agent Skender testified that in April 2019 he began investigating Morgan Jr. for drug distribution. (Evid. Hr'g Tr. at 5-7). Law enforcement learned that Morgan Jr. was on home detention and using other individuals to expand and distribute his narcotics throughout Fort Wayne. (*Id.*). In January 2020, Knox came onto law enforcement's radar as a member of the conspiracy. Around that time, co-conspirator Larry Lamb's house on Third Street had been raided by the Fort Wayne Police Department and a CI informed agents that Knox's house on Castle Drive was the new drug house. (*Id.*).

Constant surveillance then ensued at the Castle Drive address and agents observed "in and out traffic all day, all night." (Evid. Hr'g Tr. p. 7). In February 2020 officers conducted trash pulls at the Castle Drive address and located drug evidence and mail addressed to Knox. (PSR ¶ 15). Knox was also identified as a participant in controlled buys involving two different CIs on March 26, 2020 (PSR ¶¶s 18-20), July 16, 2020 (¶¶ 28-35), July 21, 2020 (¶¶ 36-37), July 28, 2020 (¶¶ 38-41), and August 10, 2020 (¶ 42).

According to Agent Skender "[a]ll transactions were coordinated through [Morgan Jr.]. Any time that our CI's ordered up drugs, they always contacted [Morgan Jr.] before they went to

whoever they were told to go to or whoever delivered the drugs to them." (Evid. Hr'g Tr. at 8). Sometimes Morgan Jr. delivered the narcotics himself and other times he sent a courier. (*Id.*). Knox was one such courier and his home on Castle Drive was a location for some of the controlled buys.[4] None of this evidence was disputed by Knox during the hearing.

The PSR provides precise details of the conspiracy, and the Government presented evidence consistent with the PSR. Knox had considerable involvement in the conspiracy's activities, engaged with various participants, and acted in furtherance of the conspiracy when he ran drugs for Morgan Jr. Knox testified that he "knew what was going on" and Morgan Jr. had him give people methamphetamine, fentanyl and cocaine. (Evid. Hr'g Tr. at 59). He also functioned as Morgan Jr's. drug debt collector. (*Id.*: "Q: …And he also had you picking up money for him, money that people owed him for drugs, right? A: …I done that a couple of times. Yes, I have."). The evidentiary record is clear that Knox participated in controlled buys, delivered drugs for Morgan Jr., collected drug money for Morgan Jr., and used his residence as a drug house. Thus, he was certainly engaged in actions in furtherance of the object of the conspiracy. The only question that remains then is whether Knox can be held accountable for the specific drug quantities in the PSR to which he objects. The Court finds he can.

2. ***Drugs involved in the June 5, 2020, transaction***

---

[4] As for how the controlled buys took place, Agent Skender testified as follows:

> So we typically make a telephone call to the individual to set up the deal, whether that would be [Morgan Jr.] or somebody he tells us to call.
> Prior to the CI meeting with that person, their person is searched, as well as their vehicle, if they're driving. And then they are provided with pre-recorded buy money and they are outfitted with some type of electronic equipment, whether that be a recorder, a camera or a transmitter.

(*Id.* at 8-9).

At the evidentiary hearing, the Defendant objected to the June 5 quantities included in the PSR. The PSR attributed 49.9 grams of fentanyl (124.75 kg of converted drug weight) to Knox. Although he objected at the hearing, Knox has presented no legal or factual argument in his brief as to why this amount should not be attributable to him. In contrast, the Government produced two recorded telephone calls between CI #2 and Frederick Morgan, Jr. (Morgan) to set up a controlled purchase of fentanyl from Morgan Jr. and Knox. (Gov't Hr'g Ex. 1). During the calls, the CI and Morgan Jr. refer to Knox, presumably because the CI believed Knox would be delivering the drugs consistent with a prior buy.[5] Morgan Jr. indicates to the CI that Knox is out of town. The two then complete their transaction at a Walmart, near Knox's home.

Although Knox was not personally involved in the June 5 transaction, the Government argues that Knox knew of the conspiracy, had delivered drugs in the past for Morgan Jr.[6] and it was reasonably foreseeable that others in the conspiracy would distribute drugs even in his absence. The Court agrees that the Government has met its burden. The drugs in the June 5 transaction were part of the jointly undertaken criminal activity to which Knox pled guilty. Defendant's objection to the June 5 quantities is OVERRULED.

### 3. *July 16 and July 28 controlled buys*

Next, Knox objects to the drug quantities for the controlled buys on July 16 and July 28. The probation officer determined Knox was responsible for 24.023 grams of methamphetamine

---

[5] Agent Skender testified that CI #2 had previously picked up fentanyl from the Castle Drive residence. (Evid. Hr'g Tr. at 18).

[6] The Government presented evidence that on March 26, 2020, CI #1 completed a controlled buy involving Knox and Morgan Jr. The CI was directed to Knox's residence by Morgan Jr. and when he arrived, Knox was not there. The CI then contacted Morgan Jr. who got in touch with Knox for the delivery. Knox eventually arrived at the residence with the drugs. (Evid. Hr'g Tr. at 10). This entire transaction was recorded and provided to the Court. (Hr'g Ex. 1).

(480.46 kg converted weight) and 49.1 grams of fentanyl (122.75 kg converted weight) for the July 16 transaction. The probation officer assessed Knox with another 58.1 grams of methamphetamine (1,162 kg converted weight) for the July 28 transaction.

The Government provided the Court with two videos and surveillance photos of the July 16 controlled buy and a video and phone calls between the CI and Knox for the July 28 controlled buy. This evidence connects Knox to the drugs and both controlled buys. As for the July 16 buy, the Government's evidence shows that Knox provided the CI with "blue" methamphetamine at a Walmart. A short time later, the CI met again with Knox at his residence, and Knox provided the CI fentanyl, more methamphetamine and a firearm. Knox contends that the CI arrived at his house first and a conversation between the CI and a third party took place before Knox arrived. Knox asserts that the third-party "could have" provided the drugs to the CI. Of course, this is pure conjecture and not backed by any evidentiary support. Instead, the Court has the Government's surveillance footage which puts safely to bed Knox's assertion that someone else supplied the drugs.

Similarly, on July 28, the CI arrived first at Knox's house. Workers and Knox's girlfriend were present at the house. Knox contends that perhaps they were the source of the drugs. Again, this argument is going nowhere. The audio call provided by the Government establishes that Knox discussed providing methamphetamine to the CI. The video removes all possible doubt that Knox provided the drugs to the CI. Knox is visible on the video weighing and packaging the methamphetamine he then provides to the CI.

In short, the Government has met its burden to show that the drug weights from these transactions, which Knox was personally involved in, are properly included in the drug quantity calculation. The objection is OVERRULED.

### 4. *Drugs located at the Wayne Trace residence*

Finally, Knox objects to the inclusion of 995.8 grams of methamphetamine (19,916 kg converted weight) and .498 grams of cocaine (99.60 gm converted weight) found during the execution of the search warrant at the Wayne Trace residence.

The Wayne Trace residence belonged to a separately indicted co-conspirator, Christina Budrevich. (Evid. Hr'g Tr. at 39). Budrevich testified during Morgan Jr.'s evidentiary hearing that her home was used to store methamphetamine for Morgan Jr. (Morgan Jr. Evid. Hr'g Tr., ECF No. 322). Budrevich testified that Knox would make drug drop-offs at her residence for Morgan Jr. (*Id.* at 12). She also testified that Knox would pick up drugs from the residence to deliver for Morgan Jr. (*Id.* at 19). Knox would come to her residence often, sometimes 2-3 times a day. (*Id.* at 15). Agent Skender confirmed that during her interviews, Budrevich stated she knew Knox and he was routinely at her residence. (Evid. Hr'g Tr. at 40). Knox, however, testified that he had never been to Budrevich's home. (Evid. Hr'g Tr. at 58: "I don't go to that girl's house, been to her house or nothing.").

CI #2 made arrangements with Morgan Jr. and Knox to buy methamphetamine. The CI met with Knox at the Castle Drive residence and requested another 3 ounces. Knox was short 11 grams. The CI then contacted Morgan Jr. to find out where he would get the rest of the drugs. (PSR ¶ 42). After several additional calls between Morgan Jr., Knox and the CI, surveillance units observed Knox leave his home, meet with Budrevich at a gas station, and return to his home. Knox then provided the CI with the other 11 grams.

The Government argues that the probation officer properly included the amounts from the search of the Wayne Trace residence in the drug calculation. In its view, Knox knew Budrevich was storing drugs for Morgan Jr., it related to the drug activity Knox was involved in and thus it

8

was foreseeable that Knox would be responsible for the drugs found there. Knox, in turn, argues the opposite -- it was not foreseeable because he was never at Budrevich's home and he only met her at the Xpress Gas Station on August 10.

Having observed and heard Knox's testimony, his denials of having never been to Budrevich's home ring false. Knox did not provide credible testimony especially when compared with Budrevich's testimony in Morgan Jr.'s case. Unlike Knox's general denial, Budrevich provided believable, detailed, consistent information when she testified during Morgan Jr's hearing. That testimony placed Knox at her residence regularly to deliver drugs for Morgan Jr. Further, the interaction on August 10 between Budrevich and Knox establishes Knox's knowledge that he could get Morgan Jr.'s drugs from Budrevich. Thus, the Court finds that the Government has sustained its burden and the drug amounts from the Wayne Trace address are properly included in the PSR.

**B. Obstruction of Justice Enhancement**

Section 3C1.1 of the Sentencing Guidelines provides for a two-level enhancement if a defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense." The probation officer assessed the two-point enhancement in the PSR because the officer concluded that Knox's acts of calculated evasion constituted willful obstruction. (PSR ¶ 56). Defendant objects to this conclusion because "the mere fact that the Defendant was not immediately apprehended by law enforcement does not demonstrate that the Defendant was willfully obstructing justice." (Dft's Brief, p. 6). The Government has the burden of proving the obstruction enhancement by a preponderance of the evidence. *United States v. Wiggins*, 134 Fed. Appx. 946, 948 (7th Cir. 2005).

Defendant is correct that ordinarily, "avoiding or fleeing from arrest" is not enough to warrant application of the enhancement. U.S.S.G. § 3C1.1, Application Note 5. However, the Seventh Circuit has clarified that some efforts at "calculated evasion," distinguishable from "panicked instinctive flight," can support the enhancement. See *United States v. Schwanke*, 694 F.3d 894, 897 (7th Cir. 2012). To this end, the Court looks at whether the flight is "likely to burden a criminal investigation or prosecution significantly—likely to make the investigation or prosecution significantly more costly or less effective than it would otherwise have been." *United States v. Cisneros,* 846 F.3d 972, 975 (7th Cir. 2017) (quoting *United States v. Nduribe*, 703 F.3d 1049 (7th Cir. 2013).

Knox testified that he knew his house had been raided by federal law enforcement officers and he also knew they had an arrest warrant for him. He also claimed that he was home at his residence every night. At first when questioned on direct examination, Knox testified as follows:

> A.   When my house -- my house got raided, I was across town smoking dope. When I came home -- when I came home that night, it was glass out on thing. Did I hear about my house, the police coming to my house? Yes, I did. And when I seen, when I got there, I seen glass on my porch. They ain't -- … I ain't never leave Fort Wayne. I ain't go nowhere. I ain't going nowhere. And I was a, uh, I seen the paperwork at my house that says the police had been there. They left a couple of sheets of paper. I, um, I knew they was coming back to get me. What was I supposed to do?
>
> Q.   Okay. So you didn't –
>
> A.    I can't go nowhere. Where am I go?
>
> Q.   You didn't leave town then?
>
> A.   No, I didn't leave town. Where am I going to go? Yeah, I talked to people and told them I was out of town. I had a warrant for my arrest. I ain't go out of town. How am I going to go out of town. With what?

(Evid. Hrg. Tr. p. 58). On cross-examination, Knox confirmed that after the warrant was served at his residence, he knew that the police were looking for him:

> A. Yeah, and I didn't go nowhere. They could have came back the next day and got me or the day after that or the day after that or all the days up until the time of my arrest.
>
> Q. They were at your house the whole time.
>
> A. Who? I came to my house every night and went to bed, every night and got into bed with her, every night.

(Evid. Hrg. Tr. p. 63).

Truthfulness is not Knox's strong suit. Knox undermined himself nearly every time he spoke at the hearing. And not only did he do himself no favors, but he managed to lend even more substance to the Government's evidence in the process. Paraphrasing Shakespeare, Knox "doth protest too much" that he did not intend to dodge police. The Court views Knox's protestations as conveying the very opposite of what he says. *United States v. Allied Stevedoring Corp.*, 241 F.2d 925, 933 (2d Cir. 1957) ("Again and again in all sorts of situations we become satisfied, even without earlier contradiction, not only that a denial is false, but that the truth is the opposite: 'The lady doth protest too much, methinks.'"). Given his limited means, lack of employment (Evid. Hr'g Tr. at 56: I ain't had no job."), and level of intellect, the Court may be giving Knox more credit for being "calculated" than he deserves. That said, Knox may not have left the state, but he certainly did not walk into the police station to turn himself in either. While he focuses on whether he, in fact, left Indiana or instead remained holed up in his house awaiting inevitable capture, it really makes no difference for purposes of the enhancement. What matters is whether Knox intended to make it more difficult for law enforcement to find him and whether his actions added a substantial burden to the criminal investigation or prosecution.

Recorded jail calls reveal that Knox was actively evading arrest or, at the very least, wanted authorities and others to believe that he had left Indiana. He told an inmate in the calls that "the feds were looking for him," he was not in Indiana, was not "mobile" and "does not move in the

11

daytime." While he was on the lam, law enforcement officers surveilled his residence and tried to contact him using the informant, both to no avail. So, the Court is hard-pressed to believe Knox was tucked snugly in his bed every night as he claims. But even if he was at home, for over two weeks, Knox knew he had a warrant and eluded agents. They eventually obtained a tracking warrant for his cell phone and, only then, did they locate him – 20 days after they first raided his residence and sought to serve the arrest warrant.

Knox still argues that none of the above proves that he intended to mislead law enforcement. He points out that he was arrested at his house consistent with his testimony and so he cannot have been evading authorities. The Court disagrees.

Knox's statements in the jail calls show an attempt by him to evade authorities. It is no secret that jail calls are recorded, that authorities would listen to them, and Knox admitted that he purposely told others that he wasn't in Indiana. The reasonable inference from that testimony is that Knox didn't want anyone, including law enforcement, looking for him in Indiana. In other words, he was trying to take the heat off himself by claiming he had fled the state. For this reason, the Court finds that Knox intended to redirect anyone who may be looking for him by telling the jail caller he was not in Indiana, not in plain sight during the day, and not mobile. The Court further finds that Knox's conduct made the criminal investigation more burdensome in that it required more law enforcement effort to surveil his residence and obtain a tracking warrant for his cell phone. Knox's objection to the two-level enhancement is OVERRULED.[7]

---

[7] Even if Knox's conduct did not rise to the level of "calculated evasion" to support the enhancement, his testimony at the sentencing hearing may be an alternate ground to support it. Perjury is an example of conduct warranting the enhancement for obstruction, *United States v. Dinga*, 609 F.3d 904, 909 (7th Cir. 2010). Knox knowingly made material false representations at the hearing. He denied having been to the Wayne Trace residence and denied that the telephone numbers called by the CIs were his numbers. Yet the Government had pages upon pages of text messages referring to Knox by his moniker "E-Nox" and "McNeil" (his middle name). Moreover, one of the phone numbers was in the tracking warrant obtained by agents after he evaded arrest.

12

## **CONCLUSION**

For the reasons above, the Defendant's Objections to the PSR (ECF No. 262) are OVERRULED. The Defendant's Motion to Strike (ECF No. 333) is DENIED as MOOT. The Court shall set this matter for a sentencing hearing through separate minute entry.

SO ORDERED on April 21, 2022.

s/ Holly A. Brady<br>
JUDGE HOLLY A. BRADY<br>
UNITED STATES DISTRICT COURT